# In the United States Court of Federal Claims

No. 09-300V
(Filed: December 19, 2014)
(Reissued: January 6, 2015)[1]

* * * * * * * * * * * * * * * * * * * *

KIM and RICHARD CASTALDI,
Parents and next of kin to Vincent
Castaldi, a minor,

              *Petitioners*,

v.

SECRETARY OF THE
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

              *Respondent.*

Vaccine injury; Autism; Hepatitis A vaccine; Timeliness; Onset of symptoms.

* * * * * * * * * * * * * * * * * * * *

    *Andrew D. Downing*, Phoenix, AZ for petitioners.

    *Darryl R. Wishard*, United States Department of Justice, Civil Division, Washington, DC, with whom was *Stuart F. Delery*, Assistant Attorney General, *Rupa Bhattacharyya*, Director, *Vincent J. Matanoski*, Deputy Director, *Gabrielle M. Fielding*, Assistant Director, for defendant.

## OPINION

BRUGGINK, *Judge*

    Currently before the court is petitioners' motion for review of the Special Master's findings of fact pertaining to onset, filed on April 26, 2012,

---

[1] In accord with the Rules of the Court of Federal Claims ("RCFC), App. B, Rule 18(b), this opinion was initially filed under seal to afford the parties with 14 days to propose redactions. The parties did not propose any redactions. Accordingly, the opinion is reissued publically in its original form save for correction of two minor clerical errors.

and her subsequent decision for respondent of June 25, 2014, which held that the petition was untimely and, in the alternative, that petitioners had not shown causation. The matter is fully briefed, and oral argument was held on December 2, 2014. Because we find no legal error or other irrationality in the conclusion that the petition was untimely, we deny petitioners' motion for review.

BACKGROUND[2]

On May 12, 2009, petitioners Kim and Richard Castaldi filed a petition for compensation under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-1 to 300aa-34 (2012) ("Vaccine Act"), on behalf of their minor son, Vincent. The petition alleges that Vincent had a severe adverse reaction to a hepatitis A vaccine he received on May 8, 2006. Subsequent to filing, Vincent was diagnosed with autism spectrum disorder, and petitioners now allege that it was caused by the hepatitis vaccine. Respondent moved to dismiss the case as untimely, arguing that the medical records demonstrated onset of symptoms more than 36 months before the petition was filed. The case was stayed pending the Federal Circuit's decision in *Cloer v. Secretary of Health & Human Services*, as it pertained to the issue of the Vaccine Act's statute of limitations. *Cloer* was decided *en banc* on August 5, 2011. 654 F.3d 1322 (Fed. Cir. 2011).[3]

The Special Master conducted a hearing on December 14, 2011. She took testimony from fact and expert witnesses, along with documentary evidence from experts. On April 26, 2012, the Special Master issued an Order and Ruling on Facts Pertaining to Onset. In it, the Special Master delineated

---

[2] The facts are drawn from the Special Master's rulings dated April 26, 2012, and July 29, 2014, and from the exhibits cited therein. Those opinions were originally issued earlier but were released to the public on the dates indicated above.

[3] 42 U.S.C. § 300aa-16(a)(2) imposes a 36-month time limit for filing a petition after symptom onset. The Federal Circuit in *Cloer* held that, although the Vaccine Act's limitations period was not jurisdictional and could therefore be tolled, at least theoretically, the test for when it begins running is an objective one based on the first occurrence or manifestations of symptoms, not on the date when the petitioners knew or should have known of the injury. 654 F.3d at 1337-39.

facts that are not in dispute about symptom onset, and made a number of findings on disputed points relating to Vincent's condition and the timing of various symptoms. The Special Master also directed petitioners to provide further records regarding Vincent's daycare programs and especially any applications for admission and evaluations regarding behavior and skills. She also allowed the parties to file additional expert reports regarding "whether the behaviors identified are recognized as symptoms of an autism spectrum disorder by the relevant medical community." *Castaldi v. Sec'y of HHS*, No. 09-300V, slip op. at 20 (Fed. Cl. Apr. 26, 2012). The parties were directed to conform any additional expert opinions to the facts as found in the post-hearing order. The parties were also afforded an opportunity to file briefs regarding the Federal Circuit's *en banc* decision in *Cloer*. The Special Master did not rule on respondent's motion to dismiss at that time.

Petitioners then filed a motion for review of the factual findings related to onset. We denied that petition as not ripe for disposition because the Special Master's decision was preliminary and ruled on neither the motion to dismiss nor on petitioners' claim for compensation. *Castaldi v. Sec'y of HHS*, No. 09-300V (Fed. Cl. July 12, 2012) (order denying motion for review as unripe).

After another stay pending appeal of the decision in *Cloer* to the Supreme Court, the parties submitted additional evidence and expert opinion. Respondent submitted the report of Dr. Max Wiznitzer; petitioners elected not to submit any supplemental reports. The Special Master issued a decision on June 25, 2014, made public on July 29, 2014, which incorporated her earlier findings and evaluated the additional information submitted by the parties. She held that petitioners failed to establish the timeliness of their petition because the weight of the evidence suggested that Vincent's symptoms manifested earlier than three years prior to the filing of the petition. *Castaldi v. Sec'y of HHS*, No. 09-300V, 2014 WL 3749749, at *15 (Fed. Cl. June 25, 2014). She thus dismissed the petition as untimely. The Special Master also held, in the alternative, that petitioners had not met their burden to prove causation, specifically rejecting petitioners' expert's opinion as lacking any causative theory. *Id.* at *16. We turn now to the specifics of the evidence and the Special Master's decision.

I. Medical Records

A review of the relevant medical records reflects the following facts. Vincent was born on April 14, 2004. His condition as a newborn was recorded

as healthy, and contemporaneous medical records further report that he grew and developed normally through his first year. He received normal childhood vaccines during that year. He experienced several minor illnesses, none unusual, but was not hospitalized during his first year.

His treating pediatrician, Dr. Pilar Escobar, noted appropriate growth and development at his nine-month visit in January 2005. Dr. Escobar recorded that Vincent was able to stand, cruise, and engage in vocal play. At his 12-month visit, Vincent's mother, Mrs. Castaldi, reported to Dr. Escobar that Vincent had just begun walking that week and that he was imitating sounds. Dr. Escobar recorded that his developmental progress was normal. Vincent was suffering from the flu but was otherwise a healthy child at the time of this visit.

At Vincent's 15-month check-up in July 2005, Dr. Escobar's records reflect that Vincent was in good health and was very active. His motor skills were satisfactory, and he was recorded as having a "few word" vocabulary and chattering frequently. *Id.* at *4. Similar results were noted during Vincent's 18-month visit. Mrs. Castaldi reported and Dr. Escobar noted that Vincent had begun using small phrases in speech. Vincent was administered the influenza vaccine during this visit.

Vincent visited Dr. Escobar several times throughout the next three months for a viral malady, influenza, and bronchitis. He had a 101 degree temperature preceding a January 27, 2006 visit, and he tested positive for influenza. After recovering from the flu, Vincent did not visit the doctor again for several months.

Vincent's two-year doctor's visit took place on May 8, 2006.[4] Dr. Escobar's notes reflect that Vincent babbled but was overall quieter than his sister had been at that age. Vincent was recorded as having a good appetite. Dr. Escobar also noted concerns from Mrs. Castaldi regarding Vincent's vision because he frequently bumped into things, especially on his left side. Mrs. Castaldi thought that he had trouble focusing on close objects. Otherwise, Vincent was recorded by Dr. Escobar to be in good health and to have a "few word vocabulary," talking in short sentences. *Id.* at *5. She also recorded that Vincent was very active, inquisitive, and had explored the room during the

---

[4] Vincent's records also show a cancelled optometry appointment in March 2006.

visit. Dr. Escobar referred Vincent to an ophthalmic evaluation. Vincent was also given the allegedly causal hepatitis vaccine at the conclusion of the visit.

Vincent and his mother visited an ophthalmologist two weeks later on May 23, 2006. Dr. Brown, the ophthalmologist, recorded that Vincent cried throughout the examination. He also noted that, in addition to vision problems, Mrs. Castaldi, who is a speech pathologist, stated concerns regarding Vincent's speech. Dr. Brown concluded that Vincent was farsighted, believed that he had a "mixed developmental disorder," and advised consultation with a neurologist. *Id.*

Mrs. Castaldi discussed the results of Dr. Brown's evaluation with Dr. Escobar on June 8, 2006. Dr. Escobar's notes from that visit reflect that he and Vincent's mother discussed both Vincent's vision difficulties (poor peripheral vision and bumping into close objects) and possible speech delay. The notes further record that Vincent played well with his older sister, but did not have a lot of contact with other children. Dr. Escobar also noted that Vincent "vocalizes but has limited verbalization" and that he reacts to sound by turning to investigate it. Pet'rs' Ex. 11 at 150. Based on her observation at the time, in Dr. Escobar's opinion, Vincent's "motor tone and activity [were] appropriate for [his] age." *Id.*

Dr. Escobar saw Vincent again on August 22, 2006, when Mrs. Castaldi brought him in with an apparent bout of stomach flu. The notes from that visit reflect that Mrs. Castaldi was concerned that Vincent's appetite had regressed and that he was shaky upon waking in the mornings. Mrs. Castaldi was also concerned that Vincent was clumsier in general and ran into objects in his left field of vision. She further expressed concern that his oral communication had regressed, specifically that, instead of speaking in words and short sentences, he mostly jabbered. Mrs. Castaldi thought that Vincent was experiencing abnormal separation anxiety from her and that he needed to have a toy with him at all times. Mrs. Castaldi traced these changes back to "the spring." *Id.* at 152. Dr. Escobar's physical examination showed no particular problems, and she recorded that Vincent's "motor tone" was "satisfactory." *Id.* Dr. Escobar was concerned with Vincent's speech and activity regression. Her treatment plan included a future cranial MRI and possible referral for a neurological evaluation. Notes from a follow-up visit a week later show that an MRI and a further pediatric ophthalmic evaluation had been scheduled.

Dr. Escobar saw Vincent again on September 22, 2006. His mother reported an episode that occurred on September 18 in which Vincent became

very stiff on his way to preschool, and Mrs. Castaldi thought that Vincent's movements had been "jerkier" ever since. *Id.* at 156. The notes from that visit also reflect that Mrs. Castaldi relayed that Vincent would not sit still at school and did not interact with other children. Dr. Escobar did not believe that Vincent had suffered a seizure but did recommend that Vincent receive an EEG test with Dr. Marc Hille. She also recorded that Vincent's MRI had not shown anything abnormal.[5] The notes also state that a special needs program, Sooner Start, was evaluating Vincent for eligibility to receive care.

Vincent's first Sooner Start evaluation took place at home on July 31, 2006. Records from that evaluation reflect that Dr. Escobar thought Vincent's motor skills were appropriate for his age but that other developmental skills might be delayed. The notes also recorded that Vincent was at a preschool twice a week, the one referred to by Dr. Escobar at which Vincent did not interact with his classmates. As part of the Sooner Start continuing evaluation, Mrs. Castaldi filled out two questionnaires regarding Vincent. One was for his condition at 27 months and the other for his condition at 30 months of age. Although she reported that his gross motor skills were adequate, he was unable to follow simple instructions such as "close the door" or "take my hand." Pet'rs' Ex. 13 at 482. Additionally, Mrs. Castaldi indicated that Vincent could not point to his body parts on command or identify pictures of simple objects. She also reported that he had, since the late Spring, stopped using simple phrases such as "me drink." *Id.* She dated the beginning of his regression to the "late spring." *Id.* at 485. The 30-month questionnaire further revealed that Vincent was now more clingy than before, indicating that Vincent had been fine to attend a Sunday morning children's program at church up until "late spring." *Id.* at 489. He did not like to be cuddled, did not greet familiar adults, and did not like stories. Although he appeared happy, he neither liked to play with others nor followed directions.

The evaluator also noted that Vincent appeared interested in toys and had adequate motor skills. Although Vincent vocalized, he did not use words during the initial home evaluation. The notes from that visit reflect that Vincent had been imitating words and using two-word phrases formerly but

---

[5] Petitioners did take Vincent to Dr. Hille, and the notes from that visit on November 8, 2006, reflect much the same as those of Dr. Escobar's: Vincent had been progressing normally until age two. Dr. Hille recommended an EEG to rule out an epileptic cause of developmental delays and noted the possibility of autism. *See* Pet'rs' Ex. 7 at 34-35.

6

that "all stopped in the late spring" around the time that Vincent had the flu. *Id.* at 593. Those records also show a handwritten note that Vincent had suffered from the flu in February and that he had "lost a lot of words in March." *Id.* at 598. Vincent was referred to an occupational therapy evaluation on September 14, 2006, and a plan to progress Vincent's self-care skills was outlined.

Dr. Escobar referred Vincent to a developmental pediatrician, Dr. Laurie Kukas. Dr. Kukas evaluated Vincent for the first time on November 4, 2006. Her notes from that visit reflect that Vincent was progressing normally "until shortly after his 2nd birthday." Pet'rs' Ex. 11 at 257. Vincent was responding to his mother's direction and pointing at things when he was 18 months old, according to Dr. Kukas' notes, and Mrs. Castaldi observed a 30 word vocabulary. "Approximately 2 months prior to his initial evaluation, he regressed to jargon." *Id.* The notes from that visit go on to record that the petitioners were concerned with a possible autistic disorder, but Dr. Kukas noted that "his regressions are later than typically reported with these disorders." *Id.* at 258. The notes also stated that Vincent had been overwhelmed at preschool and had been pulled out of that program in September 2006. Petitioners also reported to Dr. Kukas episodes of blank staring beginning in May or June of 2006. Dr. Kukas diagnosed "global developmental delays . . . with history of normal milestones until 2nd birthday followed by regression especially in speech/language, social, and adaptive areas." *Id.* at 259. She suspected autistic spectrum disorder ("ASD") but wanted to address the possibility of seizures before a formal diagnosis of ASD.

Vincent was evaluated at Cook Children's Medical Center for global developmental disorders on February 19, 2007, when he was formally diagnosed with ASD. Vincent was later referred to a child neurologist, Dr. Harley Morgan, and another pediatrician Dr. Kathleen Koljack. The records of neither of these doctors were discussed by the Special Master in her findings of fact and subsequent opinion except as noted below.

II. Hearing Testimony

At the hearing in December 2011, the Special Master heard testimony from Dr. Escobar and from Mrs. Castaldi. We briefly summarize their testimony below.

A. Dr. Escobar's Testimony

For the most part, Dr. Escobar's testimony traces her notes as outlined above. She testified that she thought petitioners to be responsible parents, and that being the case, she would expect the Castaldis to have brought Vincent in for an examination if he was showing signs of a neurological condition. Dr. Escobar testified that she did not observe any signs of neurological disorder prior to Vincent's visit on June 8, 2006–a month after the vaccine was administered. She also testified that most of the information in her notes concerning Vincent's speech and behavioral development were from Mrs. Castaldi's oral reporting and not her own examination. *See, e.g.*, Tr. 22, 34.

The Special Master asked Dr. Escobar whether she used any checklists, such as the Denver Developmental Inventory or similar tools in assessing Vincent's development. Dr. Escobar answered that she used them "informally" by asking questions typical of "those types of screens" but that she did not use a checklist or any sort of pass/fail test. Tr. 32-33. The Special Master also asked Dr. Escobar to quantify her use of the term "few words," which appeared in her notes from the July 2005 and May 2006 examinations. She was unable to do so. She did explain that she meant "a few words that could be clearly understood" as reported by Mrs. Castaldi, who was known to Dr. Escobar as a speech therapist. Tr. 34. The court followed up by asking what would have triggered Dr. Escobar to have been concerned about the child's vocabulary. Dr. Escobar indicated that, at two years of age, if the child was unable to say simple words like "mama" or 'dada," she would have been concerned. Tr. 35. She was unable to recall what the Denver Developmental Inventory regarded as a normal vocabulary for a two-year old child.

Dr. Escobar further testified that she found Mrs. Castaldi to be a reliable observer and reporter of Vincent's progress. *See* Tr. 36. Dr. Escobar would therefore expect Mrs. Castaldi to have given "fairly consistent accounts over time of the same event." Tr. 39.

B. Mrs. Castaldi's Testimony

Mrs. Castaldi was, during the period in question, Director of Special Services for Sapulpa Public Schools. She had previously been employed as a speech and language pathologist. She holds a Master of Science in communication sciences and disorders and a Master of Education in school counseling.

Based on her professional experience, Mrs. Castaldi believes that Vincent's speech development at 15 months was age appropriate. She testified

8

that Vincent recovered from the flu about a week after the January 2006 visit to Dr. Escobar. She was asked by her counsel whether she observed any speech or vocabulary problems directly after the flu in January 2006. She answered in the negative. *See* Tr. 50. She further testified that she observed nothing out of the ordinary with Vincent's health or speech development between that visit and the May 8, 2006 two-year check up.

Concerning the records from the May 8, 2006 visit, Mrs. Castaldi was asked to clarify Vincent's vocabulary level because the report from that visit indicated that he had a "few word" vocabulary and "babble[d]" but also stated that "he like[d] to talk in sentences." Tr. 52. At the hearing, she testified that Vincent had around a 500 word vocabulary and was "speaking in at least three- to four-word sentences at that point, sometimes longer if the occasion arose." Tr. 53. As an example, if he wanted a drink, she recalled that he would say "I want juice" or "I want a drink." *Id.* As a speech pathologist, she saw nothing wrong with his development as of May 8, 2006.

Mrs. Castaldi went on to testify that she began to be concerned regarding Vincent's speech about a week before Vincent's ophthalmology exam on May 23, 2006. She relayed a specific incident that had happened between those two examinations. On May 19, 2006, she took Vincent with her to work at the school, as she did frequently. She recalled Vincent being very fussy and upset that day when he was with her at work. What caused Mrs. Castaldi to take particular note, however, was that, when she brought Vincent to her office, he did not react positively to a colorful poster on the wall that displayed the alphabet. She testified that normally he would stop at that poster and say some letters, pointing at the poster. She stated that, at that point, Vincent knew his ABCs. Tr. 59. On May 19, 2006, however, Vincent "got really upset and started crying." *Id.* This was, in her recollection, the first time that she was concerned about Vincent's development because it was different from how he acted in the past, and thus "it really caught [her] attention." *Id.*

On cross-examination, counsel for the government asked Mrs. Castaldi if she could recall specific instances prior to May 19, 2006, when Vincent had pointed at the alphabet poster and verbally repeated some of the letters. She answered: "Not a specific date. No." Tr. 80. Counsel then asked for a general time, such as a month. She answered: "I really can't specifically. I just remember at least a couple of times, him coming up there and doing that ABC poster, and we were working a lot with my daughter on her ABCs at that point." *Id.* She was then asked to give a general time when Vincent began to

9

say his ABCs. Mrs. Castaldi: "I would say probably shortly before his second birthday, he could at least name them." Tr. 80-81. She testified that Vincent picked up the ABCs from observing Mrs. Castaldi working with her then-four-year old daughter, who had experienced some developmental delays as well.

We note at this point the affidavit testimony of her husband, Richard Castaldi. He stated in his declaration of November 28, 2011, that Vincent had been, prior to May 8, 2006, developing normally. "He was singing typical songs (like the alphabet) and was starting to say his ABCs. Pet'rs' Ex. 17 at 700.

Mrs. Castaldi was asked to describe Vincent's speech regression after May 2006. She testified that it started slowly: he regressed from sentences, such as asking for things, to labeling objects. The regression continued to a general decline in his total vocabulary, eventually all the way back to "babble, jargon, and just not understandable words." Tr. 62. She was asked about the statements in Vincent's medical and school records that might indicate onset of speech regression prior to the vaccine administration. She testified that she may have stated that problems began after his struggle with the flu, but that, in reality, the symptoms did not begin within 30 days of the doctor visit in January 2006. She was also asked if she had told the Sooner Start evaluator that Vincent's problems began after his flu illness in February 2006 and that he had "lost a lot of words in March." *See* Tr. 63 (referencing the Sooner Start evaluation in July 2006). She answered that she might have said that but that Vincent had not had the flu in February. *See* Tr. 63-64. She explained that she did not have Vincent's medical records in front of her at the Sooner Start home evaluation and that the purpose of that evaluation was not to pinpoint precisely when things happened in his medical history. Tr. 65. She further stated that this was generally the case with all of Vincent's medical records. Exact timing was not important.[6] She did agree with respondent's counsel, on cross-examination, however, that accuracy in relaying symptom history is important as a speech pathologist. *See* Tr. 86.

Mrs. Castaldi also testified regarding the vision problems that prompted the referral to Dr. Brown. She recalled a specific event prior to the May 8 visit

---

[6] Mrs. Castaldi also noted a further inaccuracy in the Sooner Start evaluation record, in which it is stated that Vincent's regression began after a bout with the flu in the Spring of 2006. *See* Tr. 65-66. She stated that the regression did begin then, May 2006, but Vincent did not have the flu during this period.

10

to Dr. Escobar when Vincent ran into a kitchen drawer that had been pulled out. Mrs. Castaldi testified that this was one particular event that she took note of and which prompted her to raise these concerns with Dr. Escobar. She also testified that her experience with her daughter–presumably vision problems–was also a factor in her concerns relayed to Dr. Escobar, mainly because she had missed signs of problems in her daughter. She was asked by her counsel whether she would have characterized Vincent's movements at the time as "stumbling around, running into walls and things like that" or even as "drunk." She replied "no, not at all." Tr. 55.

III. Expert Opinion

The parties each presented the report of one expert. Petitioners presented the opinions of Dr. Hastings, who holds a Ph.D. in anatomy and a degree in osteopathic medicine. He is board certified in internal medicine. His publications center on anatomy, hyperlipidemia, and cardiac medicine. Respondent presented the opinion of Dr. Max Wiznitzer, who specializes in treating childhood autism. He is board certified in pediatrics, psychiatry, and neurology. He teaches and practices regularly in the field of pediatrics and neurology. He has published numerous articles and book chapters on autism, including diagnosing it. We briefly summarize their opinions below.

    A. Dr. Hastings' Opinion

Dr. Hastings' report was tendered prior to the Special Master's first fact findings and was not updated after that decision. Dr. Hastings concluded that Vincent's ASD symptoms began after May 8, 2006, the date of the vaccine at issue. He placed particular importance on Dr. Escobar's notes from the May 8 visit, which he opined eliminate the notion that a January 2006 viral infection (influenza or bronchitis) was causative of the symptoms.[7] *See* Pet'rs' Ex. 15 at 693. The report states that Dr. Escobar's records from the May 8 examination confirm "the absence of . . . Autism or Autism like symptoms predating May 8, 2006." *Id.* After reviewing Dr. Escobar's records as a whole, he concluded that they establish "unequivocally . . . a normal developmental child with normal speech patterns, talking in sentence[s],

---

[7] Earlier in this litigation, the possibility that encephalitis (viral infection of the brain) caused the onset of ASD was explored by the parties. In addition to pinpointing onset, Dr. Hastings was tasked with determining whether that was a likely cause.

awake, active, alert, and inquisitive and without any of the clinical manifestations of Autism" prior to May 8, 2006. *Id.* His report goes on to state that Vincent began to exhibit "outwardly noticeable adversities" within eight days of the May 8 visit.[8] *Id.* at 677.

### B. Dr. Wiznitzer's Opinion

Respondent filed Dr. Wiznitzer's opinion after the initial factual findings of April 26, 2012. He did not disagree with any of them. He concluded, after reviewing all relevant medical records and the hearing testimony, that Vincent's regression began earlier than May 8, 2006, and specifically that his speech regression began in the March-April 2006 time period. Resp.'s Ex. F at 7. He found that the onset of other symptoms in adaptive, social, and cognitive skills occurred later. Although the records reflected a history of three to four word sentences in May 2006, he concluded these were probably "echolalic in nature and an early manifestation of ASD."[9] *Id.*

Dr. Wiznitzer acknowledged the diagnosis of motor incoordination in November 2006, but stated that the earlier history of clumsiness and running into things "with onset prior to 5/8/06 that was interpreted as being a visual problem but, more likely than not, represented an early manifestation of his motor incoordination." *Id.* This further buttressed his opinion regarding the earlier onset of ASD symptoms.

His report reflects that approximately 80 percent of parents of autistic children notice symptoms within the first 24 months, especially speech and language development impairment. *Id.* at 8. This he found to be consistent with his view that Vincent's speech delay predated his May 8, 2006 visit with Dr. Escobar. He stated that the speech regression was the "initial manifestation of his regressive ASD." *Id.*

---

[8] It is not clear what event from the medical records Dr. Hastings identified as the beginning of the symptoms, but we note, as the Special Master did, that eight days later was May 16, three days before Mrs. Castaldi relayed noticing the beginning of Vincent's speech regression. *Castaldi*, 2014 WL 3749749, at *14.

[9] Echolalia is characterized as the rapid repetition of words spoken by another person.

IV. The Special Master's Decision

The Special Master, after considering all of the evidence, dismissed the petition as untimely, finding that Vincent's symptoms of autism, speech regression and motor skill deficit, began prior to May 12, 2006, which was 36 months prior to the filing of the petition. *Castaldi*, 2014 WL 3749749, at *15.

After reviewing all of the medical records and comparing them to Mrs. Castaldi's testimony, the Special Master did not find "sufficient indicia of reliability in the testimony of Mrs. Castaldi to credit her testimony over the evidence found in the contemporaneous records." *Id.* at *10. She found Mrs. Castaldi's testimony to be inconsistent with the medical records and her statements to the treating and evaluating physicians at the time of the events. Specifically, Mrs. Castaldi's testimony at the hearing that Vincent had a 500 word vocabulary on May 8, 2006, was particularly troubling to the Special Master. She found that Mrs. Castaldi inflated Vincent's vocabulary over time and that this was an indicia of a lack of credibility as to that point. *Id.* Also rejected by the Special Master was Mrs. Castaldi's testimony regarding the May 19, 2006 incident at her office because no mention of this episode was found in any of the contemporaneous medical records. The first mention of Vincent's reaction to the alphabet picture appeared in a May 2011 affidavit of Mrs. Castaldi. *See id.* at *12.

In assessing the medical records, the Special Master found Dr. Escobar's notes to be based primarily upon the recollection and retelling of Mrs. Castaldi, and thus they could not be credited alone as establishing onset after May 8, 2006. She also found internal inconsistencies in Dr. Escobar's notes which cast further doubt on their reliability as far as establishing a time of onset, particularly the notes from the May 8, 2006 examination wherein Vincent was described as talking in short sentences in one spot and babbling with a few word vocabulary in another. *See id.* at *11.

More compelling as to actual onset for the Special Master were the records from the Sooner Start evaluations and subsequent doctor examinations in the fall of 2006 and following. She reasoned that "one would expect parents to be as accurate as possible when conveying history about their child during developmental evaluation or initial consultation by a specialist." *Id.* The Special Master found particularly telling the notation in the Sooner Start records that Vincent "lost a lot of words in March," and in Dr. Kukas' notes of November 4, 2006, that "developmental milestones were progressing

13

normally until shortly after his 2nd birthday." Pet'rs' Ex. 13 at 598; Pet'rs' Ex. 11 at 257. She also noted the records of Dr. Hille from November 8, 2006, which reflect that "normal speech and language development until just after his second birthday," as well as the records of Dr. Harley Morgan from the April 30, 2007 initial consultation that Mrs. Castaldi did not notice language problems until "around 2 years of age." Pet'rs' Ex. 7 at 34; Pet'rs' Ex. 8 at 52. Also important to the Special Master was the July 30, 2007 visit to Dr. Koljack where she recorded that Vincent was "normal until shortly before second birthday." Pet'rs' Ex. 10 at 103. These statements, taken in total, persuaded the Special Master that the likely onset date of Vincent's symptoms was more than three years prior to filing of the petition.

Regarding the expert opinions, the Special Master found Dr. Wiznitzer to be more qualified due to his experience with treating and diagnosing childhood autism disorders. She thus placed greater weight and reliance on his report. Relying on that report, the Special Master concluded that Vincent's speech regression began prior to May 8, 2006, and that his reported vision problems also reflected early symptoms of autism. She thus ultimately concluded that the petition was filed too late, not within 36 months of the onset of symptoms, and dismissed it. *Castaldi*, 2014 WL 3749749, at *15; *see also* 2012 Slip. Op. at 17-18. In her July 2014 opinion, the Special Master also addressed petitioners' theory of causation and rejected it as insufficient and unsupported by sufficient evidence, noting particularly that Dr. Hastings' report, although naming the hepatitis vaccine as causal, was devoid of any explanation of a biological mechanism whereby the vaccine caused the onset of ASD. *Castaldi*, 2014 WL 3749749, at *16. The Special Master noted that she had given petitioners several opportunities to supplement their evidence of causation. Without further evidence, the Special Master concluded that petitioners had not established causation and thus were not entitled to compensation. *Id.*

## DISCUSSION

We review decisions of Special Masters under the highly deferential abuse of discretion standard. RCFC App. B, Rule 27(b). The Vaccine Act mandates that the findings of fact below may be reversed only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa-12(e)(2)(B). Legal conclusions, however, are reviewed without deference. *Munn v. Sec'y of HHS*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992). On review, we must not "reweigh the factual evidence . . . or examine the probative value of the evidence or the credibility of the

witness" because those "are all matters within the purview of the fact finder." *Porter v. Sec'y of HHS*, 663 F.3d 1242, 1249 (Fed. Cir. 2011).

Petitions for compensation under the Vaccine Act must be filed within "36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury." 42 U.S.C. § 300aa-16(a)(2) (2012). This is "the first event objectively recognizable as a sign of a vaccine injury by the medical profession at large." *Markovich v. Sec'y of HHS*, 477 F.3d 1353, 1360 (Fed. Cir. 2007). This is an objective test based on symptoms that occurred and not on when the petitioners or petitioners' physicians diagnosed them. *See Cloer*, 654 F.3d at 1338-39.

Petitioners take issue with five aspects of the Special Master's findings and opinion: 1) failure to accord appropriate weight to the records and testimony of Dr. Escobar as the treating physician; 2) error in giving greater weight to later records as opposed to the contemporaneous records of Dr. Escobar; 3) failure to understand the difference between a 500 word total vocabulary and a 30 word set of commonly used words or phrases; 4) error in rejection of Mrs. Castaldi's testimony regarding the events of May 19, 2006; 5) error in affording too little weight to Dr. Hastings' report.

Respondent argues that the Special Master's earlier factual findings and later opinion, taken together, make clear that she considered the record as a whole, missing nothing, and appropriately weighed the evidence presented. That the Special Master weighed certain evidence more favorably for respondent is well within her discretion as the finder of fact, according to respondent, and, because the record indicates onset of symptoms prior to May 12, 2006, the dismissal was proper. We agree.

We begin with petitioners' final three exceptions. As to the distinction petitioners argue regarding the difference between a 500-word total vocabulary and some smaller subset of frequently used words, it is too late now to raise that as an explanation for Mrs. Castaldi's testimony. Petitioners argue that the Special Master should have asked for further clarification rather than "ambush" petitioners in her opinion by using it as a reason to discredit Mrs. Castaldi's testimony as a whole. We disagree. Petitioners' counsel had every opportunity on direct examination or redirect to ask Mrs. Castaldi to explain her testimony regarding Vincent's alleged 500-word vocabulary. Hearing no further explanation, it was neither arbitrary nor capricious for the Special Master to have taken note of the apparent discrepancy between that testimony

and the bulk of the medical records in this case. Nor was it irrational to conclude that Mrs. Castaldi's recollection could not be relied on, given the wide variance between the sources, especially the records of Dr. Escobar, which were based largely on Mrs. Castaldi's recollection at the time of the events.

As to the events of May 19, 2006, we are not in a position to second guess the Special Master's consideration of that piece of evidence in contrast to the rest of the evidence in the case. She rejected Mrs. Castaldi's testimony in 2009 and 2012 regarding this event because the contemporaneous records did not include any mention of it, and because there were other statements indicating onset prior to that alleged event. We cannot say that this was arbitrary or capricious.

The Special Master's weighing of Dr. Hastings' report is likewise not irrational. The Vaccine Act tasks the Office of Special Masters with considering voluminous medical records and after-the-fact expert reports. It is precisely the role of the Special Master to sort between them and decide which are the most persuasive. Petitioners' argument that, as an internist, Dr. Hastings is particularly well-suited to make a determination of causation and onset is one best made below. The Special Master reached a different conclusion. Petitioners have not identified a legal error in that conclusion, and we are not in any position to substitute our judgment for that of the finder of fact.

We also cannot say that it was reversible error for the Special Master to assign relatively less weight to the testimony and notes of Dr. Escobar, compared with later medical records. The Special Master recognized that normally treating physicians are in a better position to assess and record the medically relevant facts and diagnosis. *See Andreu v. Sec'y of HHS*, 569 F.3d 1367 (Fed. Cir. 2009). The Special Master considered Dr. Escobar's records and testimony as a part of the record as a whole. The fact that her records were largely based on Mrs. Castaldi's recollection rather than Dr. Escobar's own observations was of significance in the Special Master's calculus. Her conclusion that Mrs. Castaldi's testimony lacked credibility and resulted from faulty recall were relevant considerations in her weighing of Dr. Escobar's notes versus later statements in the medical records which reflected earlier onset of symptoms. The fact that a reasonable finder of fact might have come to a different conclusion does not establish legal error. *See Hodges v. Sec'y of HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993).

We recognize that the records from Sooner Start and those of Doctors Hille, Kukak, Morgan, and Koljack, cited by the Special Master as probative, are not independently determinative of the date of onset. They, like the records of Dr. Escobar, are based on the recollection of Mrs. Castaldi. The Special Master, however, considered the record as a whole and was assisted by expert opinion based also on that record. Dr. Wiznitzer came to the conclusion that the evidence showed an earlier onset, and buttressed the statements regarding loss of vocabulary in March or April of 2006 with his independent view that Vincent's vision problems predating the May 8, 2006 visit with Dr. Escobar actually represented a lack of motor skill indicative of ASD. We note also the records of the visit with Dr. Koljack reflect problems developing before his second birthday. This represents a reasonable basis in the record on which the Special Master could reach the conclusion that she did. *See Lampe v. Sec'y of HHS*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (stating that a special master's decision should be upheld if he or she considered all of the evidence and provided a rational basis for the conclusion). It is inherent in the vaccine program that such determinations be afforded great deference; we are not tasked with a new weighing of the evidence but rather a review for irrationality or other legal error. *See Porter v. Sec'y of HHS*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). Petitioners have not presented a basis for finding such in the Special Master's decisions.

## CONCLUSION

Because the opinion of June 25, 2014, and factual findings of April 26, 2012, with respect to timeliness[10] were not arbitrary, capricious, or otherwise not in accordance with the law, we must affirm them. Accordingly, petitioners' motion for review is denied. The Clerk of Court is directed to enter judgment for respondent dismissing the petition.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge

---

[10] It is unnecessary, therefore, to address the Special Master's ruling as to causation.